THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

HENRY MORGAN SMITH,
DESIREE SMITH,

        Plaintiffs

v.                                                                                  No. Civ. 09-026 LH/DJS

BOARD OF COUNTY COMMISSIONERS
FOR THE COUNTY OF CHAVES, NEW
MEXICO, COMMISSIONER MICHAEL
TRUJILLO, individually and in official capacity;
COMMISSIONER KIM CHESSER, individually
and in official capacity; COMMISSIONER
KYLE D. WOOTEN, individually and in official
capacity; RICHARD C. TAYLOR, individually
and in official capacity; GREG NIBERT,
individually and in official capacity; CHAVES
COUNTY SHERIFF JAMES COON, individually
and in official capacity; CHAVES COUNTY
DEPUTY BARRY DIXON, individually
and in official capacity; CHAVES COUNTY
DEPUTY SHANE BAKER, individually and in official
capacity; CHAVES COUNTY DEPUTY JAMES
MASON, individually and in official capacity; CHAVES
COUNTY DEPUTY JASON TUTOR, individually
and in official capacity; and CHAVES COUNTY
DEPUTY SCOTT OUILLETTE, individually and
in official capacity,

        Defendants.

## MEMORANDUM OPINION AND ORDER

      This matter comes before the Court on "Defendants' Motion to Dismiss Unlawful Detention or Arrest and Excessive Force Claims and to Reconsider Denial of Motion to Dismiss Fourth Amendment Seizure, Failure to Train and Failure to Supervise Claims on the Basis of Qualified Immunity and Other Grounds" (Doc. 71).  The Court, having considered the pleadings, briefs, arguments, applicable law, and otherwise being fully advised, concludes that the motion should be

denied as to Plaintiffs' Fourth Amendment claims for unlawful seizure of the firearm against Defendants Barry Dixon, Shane Baker, James Mason, Jason Tutor, and Scott Ouillette in their individual capacities but should be granted in all other respects.

## I.     BACKGROUND

On July 28, 2009, Plaintiffs filed their Amended Complaint (Doc. 40), bringing suit against the Board of County Commissioners for the County of Chaves, New Mexico ("the Board"); County Commissioners Michael Trujillo, Kim Chesser, Kyle D. Wooten, Richard C. Taylor, and Greg Nibert (collectively, "the Commissioners"), in their individual and official capacities; Chaves County Sheriff James Coon ("Sheriff Coon"), in his individual and official capacity; and Deputies Barry Dixon, Shane Baker, James Mason, Jason Tutor, and Scott Ouillette (collectively, "the deputy defendants"), in their individual and official capacities.  The facts and claims as pled by Plaintiffs Henry Morgan Smith and Desiree Smith ("Plaintiffs") in their Amended Complaint were fully set forth in the Court's Memorandum Opinion and Order (Doc. 69) filed on February 10, 2010, and are incorporated herein by reference.

On August 19, 2009, Defendants filed a Motion to Dismiss on the Basis of Qualified Immunity and on Other Grounds (Doc. 50) in which they argued that Plaintiffs' claims should be dismissed because they did not violate Plaintiffs' rights and were entitled to qualified immunity. In this Court's February 10, 2010 Memorandum Opinion and Order, the Court dismissed Plaintiffs' Fourth Amendment unlawful entry claims and Plaintiffs' claims brought under the Fifth Amendment (Count II), the Fourteenth Amendment (Count III), 42 U.S.C. § 1985 (Count IV), the New Mexico Tort Claims Act (Count V), and the Second Amendment (Count VI).  The Court, however, denied Defendants' request to dismiss Plaintiffs' Fourth Amendment claims for unlawful detention or arrest, unlawful seizure of the firearm, and excessive force against the deputy defendants.  With

regard to Plaintiffs' supervisory and municipal liability claims against the Board, the Commissioners, and Sheriff Coon, the Court dismissed the claims to the extent they relied on the ratification theory but allowed them to proceed on the failure-to-train and failure-to-supervise theories.  On February 24, 2010, Defendants filed another motion to dismiss (Doc. 71), seeking the dismissal of all remaining claims and asking this Court to reconsider its previous refusal to dismiss the unlawful seizure, failure to train, and failure to supervise claims.

## II.     STANDARD

### A.     Motion to Dismiss

On ruling on a motion to dismiss, the Court must accept the factual allegations of the complaint as true. *See Erickson v. Pardus,* 551 U.S. 89, 93 (2007) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 573 (2007)); *Swanson v. Bixler*, 750 F.2d 810, 813 (10th Cir. 1984).  The Supreme Court's prescribed inquiry when reviewing a motion to dismiss is whether the complaint contains "enough facts to state a claim to relief that is plausible on its face."  *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Twombly*, 550 U.S. at 570).  To survive a dismissal, a plaintiff must "nudge his claims across the line from conceivable to plausible." *Id.* (quoting *Twombly*, 550 U.S. at 570) (alterations omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, __ U.S. __, 129 S.Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 556). Although a court must assume the veracity of well-pleaded factual allegations, such deference is "inapplicable to legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 1949 (citing *Twombly*, 550 U.S. at 555).

Pro se pleadings are interpreted liberally, *see Swoboda v. Dubach*, 992 F.2d 286, 289 (10th

Cir. 1993), but must comply with the basic requirements of the Federal Rules of Civil Procedure, *see Yang v. Archuleta*, 525 F.3d 925, 927 n. 1 (10th Cir. 2008) (quoting *Ogden v. San Juan County*, 32 F.3d 452, 455 (10th Cir. 1994)).  A pro se plaintiff is thus not relieved of the burden of alleging sufficient facts upon which to base a recognized legal claim. *See Jenkins v. Currier*, 514 F.3d 1030, 1032 (10th Cir. 2008) (citing *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991)).  "This is so," the Tenth Circuit has explained, "because a pro se plaintiff requires no special legal training to recount the facts surrounding his alleged injury, and he must provide such facts if the court is to determine whether he makes out a claim on which relief can be granted." *Hall*, 935 F.2d at 1110.

### B.      Qualified Immunity

Qualified immunity shields federal officials from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  When a defendant raises the qualified immunity defense, the plaintiff must demonstrate that (1) the facts alleged show that the officer's conduct violated a constitutional right and (2) the right was clearly established at the time of the conduct. *See Pearson v. Callahan*, __ U.S. __, 129 S.Ct. 808, 815-18 (2009); *Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000).  Whether the right is clearly established must be analyzed not as a broad proposition but with consideration to the case's specific context. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson*, 129 S.Ct. 808.  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Medina v. City and County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992).

To meet the plausibility standard in the qualified immunity context, a plaintiff must allege

sufficient facts to show that the defendants plausibly violated their constitutional rights and that

those rights were clearly established at the time.  *Robbins v. Oklahoma*, 519 F.3d 1242, 1249 (10th

Cir. 2008).  "This requires enough allegations to give the defendants notice of the theory under

which their claim is made."  *Id.*  As the Tenth Circuit explained:

> [C]omplaints in § 1983 cases against individual government actors pose a greater
> likelihood of failures in notice and plausibility because they typically include
> complex claims against multiple defendants. The *Twombly* standard may have
> greater bite in such contexts, appropriately reflecting the special interest in resolving
> the affirmative defense of qualified immunity at the earliest possible stage of a
> litigation.  Without allegations sufficient to make clear the grounds on which the
> plaintiff is entitled to relief, it would be impossible for the court to perform its
> function of determining, at an early stage in the litigation, whether the asserted claim
> is clearly established.

*Id.* (internal quotations and citations omitted).

## III.   ANALYSIS

### A.      Fourth Amendment Claims against the Deputy Defendants

Defendants argue that the Court erred in construing Plaintiffs' complaint to contain claims

for unlawful detention or arrest and excessive force.  Defendants contend that the Amended

Complaint does not adequately identify which deputy did which particular act to provide each

defendant with fair notice of the claims against him or her.  After again construing the allegations

of the Amended Complaint, the Court disagrees.

The Amended Complaint contains the following relevant allegations:  Deputy Mason asked

Mr. Smith to give him the gun, and after Mr. Smith refused, Deputy Mason told Mr. Smith that he

would be "taking the gun" and turning it over to the Alcohol Tobacco and Firearms ("ATF") for

prosecution.  (Am. Compl. ¶¶ 45-46.)  When Mr. Smith responded that Deputy Mason had no

jurisdiction to take the gun and he could not have it, two other deputies then stepped into Mr.

Smith's view, pointing their firearms at or in the general direction of Mr. Smith.  (*See id.* ¶¶ 47-48.)

5

The two deputies whom Mr. Smith first saw at the door also had their guns drawn.  (*Id.* ¶ 50.)  Mr. Smith saw an additional rifle barrel protruding from behind a patrol car.  (*See id.*)  Deputy Mason told Mr. Smith that "he had two choices to be put down immediately and they would take the weapon or Smith could turn it over to him."  (*Id.* ¶ 51.)  Mr. Smith felt he was being confronted with a "massacre situation that could evolve in the total destruction of his family."  (*Id.* ¶ 52.)  He asked his son to go to the bedroom where the gun was stored in a locked closet and get the firearm, which was unloaded.  (*Id.* ¶ 56.)  His son retrieved the gun and handed it to Deputy Mason.  (*Id.* ¶ 57.)  Deputy Mason opened the case, removed the weapon, and advised Mr. Smith that he was going to contact ATF and have him prosecuted for being a felon in possession of a firearm.  (*See id.* ¶¶ 58-59.)  The deputies then left the property without arresting Mr. Smith.  (*See id.* ¶¶ 61-63.)  Barry Dixon, Scott Ouilette, Jason Tutor, and Shane Baker were each one of the deputies who came onto Mr. Smith's property, actively participated in the events, and backed up Deputy Mason's demand to turn over the weapon or be put down.  (*See id.* ¶¶ 7-10.)

Contrary to Defendants' argument, the Amended Complaint does more than merely make vague, collective allegations against Defendants.  According to the allegations, Defendants Dixon, Ouilette, Tutor, and Baker each pointed guns at or in the direction of Mr. Smith after Deputy Mason ordered Mr. Smith to turn over his firearm.  The allegations identify specific acts of each deputy and provide each defendant with fair notice of the basis of the claims against him.

Defendants nonetheless argue that Plaintiffs have failed to state a Fourth Amendment claim for unlawful detention or arrest because they had probable cause to detain them and did so for a limited time and scope.  Although Defendants admit that, based on the allegations, Plaintiffs' detention under gunpoint may be considered an arrest, Defendants assert that, at the time the four deputies allegedly drew the firearms, they already knew that Mr. Smith was a convicted felon who

had admitted to having access to a firearm in his home.

### 1.      Unlawful detention or arrest claims

A person has been seized under the Fourth Amendment if a reasonable person would have believed that he was not free to leave or free to decline the officers' requests or otherwise terminate the encounter. *See Florida v. Bostick*, 501 U.S. 429, 436 (1991); *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Circumstances that indicate a seizure include the threatening presence of several officers, the display of a weapon, some physical touching of the person, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. *Mendenhall*, 446 U.S. at 554. A plaintiff may recover on an unlawful arrest claim if he can prove that the officers lacked probable cause to arrest him. *See Cortez v. McCauley*, 478 F.3d 1108, 1127 (10th Cir. 2007).

The warrantless arrest of a person in a public place based on probable cause does not violate the Fourth Amendment. *United States v. Santana*, 427 U.S. 38, 42 (1976) (citing *United States v. Watson*, 423 U.S. 411 (1976)). A person standing directly in the doorway of a house, at the threshold, stands in a public place and renounces the expectation of privacy. *Id.* Probable cause to support a warrantless arrest exists where the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent man to believe that the suspect has committed or was committing an offense. *See Beck v. Ohio*, 379 U.S. 89, 91 (1964). "[I]n determining whether probable cause exists, the courts must apply the 'totality of circumstances' test." *Brierley v. Schoenfeld,* 781 F.2d 838, 841 n.1 (10th Cir. 1986) (citing *Illinois v. Gates*, 462 U.S. 213 (1983)). In the qualified immunity context, a defendant is entitled to immunity if a reasonable officer could have believed that probable cause existed to arrest the plaintiff. *Hunter v. Bryant*, 502 U.S. 224, 228 (1991). Law enforcement officers who reasonably but mistakenly conclude that probable cause is present are also

7

entitled to qualified immunity.  *Id.* at 227.

According to the Amended Complaint, four of the deputies drew their guns and pointed them at or in the general direction of Mr. Smith after Mr. Smith had voluntarily answered the front door. (*See* Am. Compl. ¶¶ 6, 41-42, 49.)  Mr. Smith was standing in the foyer of the front door to his home at the time the deputies allegedly pointed their firearms at him.  (*See id.* ¶ 6, 42)  Because Mr. Smith voluntarily opened the door – after calling the police himself – and he was standing at the threshold of an open door, exposed to the public, he was not in an area where he had any expectation of privacy.  *See Santana*, 427 U.S. at 42 (concluding that suspect standing directly in open doorway was in public place); *McKinnon v. Carr*, 103 F.3d 934, 935-36 (10th Cir. 1996) (holding that arrest in doorway after police knocked on door and suspect opened door was not invalid because suspect voluntarily opened door and was visible, standing in threshold of doorway, open to public view); *United States v. Herring*, 582 F.2d 535, 543 (10th Cir.1978) (holding that officer could lawfully arrest without a warrant a suspect for whom officer had probable cause to believe committed a felony where suspect opened motel door in response to officer's knock because arrest was not made in private place).  Accordingly, under the law of this circuit, the deputy defendants could lawfully arrest Mr. Smith if they had probable cause to believe he committed a crime.  *See also United States v. Crapser*, 472 F.3d 1141, 1148 (9th Cir. 2007) ("[W]hen a suspect voluntarily opens the door of his residence in response to a non-coercive "knock and talk" request, the police may temporarily seize the suspect outside the home (or at the threshold) provided that they have reasonable suspicion of criminal activity. If an arrest in the doorway is allowed, certainly the lesser intrusion of a *Terry* stop in the hallway is also permissible."); *United States v. Carrion*, 809 F.2d 1120, 1128 (5th Cir. 1987) (upholding warrantless arrest at gunpoint of suspect for whom officers had probable cause to arrest after suspect voluntarily opened door to his hotel room upon knocking because suspect "had

no protectible expectation of privacy at the open door to his hotel room").[1]

To convict a defendant of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1), the government must prove that (1) the defendant was previously convicted of a felony; (2) the defendant thereafter knowingly possessed a firearm; and (3) the possession was in or affecting interstate commerce. *United States v. Ledford*, 443 F.3d 702, 705 (10th Cir. 2005). A conviction for violating § 922(g) may be based on constructive or joint possession of a firearm. *See United States v. Jameson*, 478 F.3d 1204, 1209 (10th Cir. 2007). Constructive possession of a firearm in joint occupancy cases is established if the person has knowledge of and access to the firearm, because in such cases, there is sufficient evidence to infer that the person had dominion and control over the firearm. *See id.* at 1209-10. Mr. Smith was not seized by gunpoint until after he admitted to the deputies that he was a convicted felon and indicated that a firearm was located in his home. Mr. Smith told the deputies that they could not have the gun, indicating that he had some access and control to it. Deputy Mason also had prior knowledge that Mr. Smith was a convicted felon. (*See* Am. Compl. ¶ 48.) These facts would indicate to a reasonable officer that Mr. Smith had dominion over the home where the firearm was located and control over the firearm itself. Although Mr. Smith asserted that his wife owned the firearm, her ownership does not negate his constructive possession of the firearm. Defendants thus had probable cause to believe that Mr. Smith was a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).

Plaintiffs nevertheless argue that, under New Mexico law, after 10 years a convicted felon has his gun rights restored, so Mr. Smith could legally possess the firearm. 18 U.S.C. § 921(a)(20)

---

[1]The Court recognizes that the circuits are split on this issue, as a few circuits have held that a suspect does not abandon his Fourth Amendment privacy interest by voluntarily opening his door in response to a police officer's knock. *See, e.g., United States v. Berkowitz*, 927 F.2d 1376, 1387-88 (7th Cir. 1991); *United States v. McCraw*, 920 F.2d 224, 228-29 (4th Cir. 1990).

provides:

> Any conviction which has been expunged, or set aside or for which a person has
> been pardoned or has had civil rights restored shall not be considered a conviction
> for purposes of this chapter, unless such pardon, expungement, or restoration of civil
> rights expressly provides that the person may not ship, transport, possess, or receive
> firearms.

The Tenth Circuit has held that a convicted felon must have had his rights to vote, seek and hold

public office, serve on a jury, and to possess firearms all restored before a prior conviction may be

excluded on the basis of restoration of civil rights. *See United States v. Flower*, 29 F.3d 530, 536

(10th Cir. 1994) (citing *United States v. Maines*, 20 F.3d 1102, 1104 (10th Cir. 1994)).  The courts

must look to state law to determine whether the conviction has been set aside, expunged, or to

determine whether the defendant has been pardoned or had his civil rights restored.  *Id.*  If a

defendant has been convicted of a felony, but has not had his civil rights restored with regard to that

conviction, the defendant can be charged under 18 U.S.C. § 922 with unlawful possession of a

firearm, regardless of whether that same possession is prohibited under the state's law.  *See United*

*States v. Fisher*, 38 F.3d 1144, 1147 (10th Cir. 1994).  The Tenth Circuit has also held that

§ 921(a)(20) is definitional, and that the government need not prove as an element of a § 922(g)

offense that the defendant's civil rights had not been restored.  *See Flower*, 29 F.3d at 535.

Applying these principles here, even if the deputy defendants had reason to believe that Mr.

Smith's gun rights had been restored under state law, the officers had no reason to believe that *all*

Mr. Smith's other civil rights had also been restored.  Indeed, the Amended Complaint does not

show that Mr. Smith's right to hold public office had been restored.  *See* N.M. Stat. Ann. § 31-13-1

("A person who has been convicted of a felony shall not be permitted to hold an office of public

trust for the state, a county, a municipality or a district, unless the person has presented the governor

with a certificate verifying the completion of the sentence and was granted a pardon or a certificate

by the governor restoring the person's full rights of citizenship."). Accordingly, the mere fact that Mr. Smith told the deputies "that he had a right to the gun because under New Mexico laws after 10 years he had his gun rights restored," (*see* Am. Compl. ¶ 45), did not vitiate probable cause to arrest him under § 922(g)(1). *See Flower*, 29 F.3d at 536 ("Because we have held that the rights to vote, *serve on a jury*, and hold public office, as well as the right to possess firearms, must all be restored under § 921(a)(20) before a prior conviction may be excluded on the basis of restoration of civil rights, Flower cannot prevail on this issue. The acknowledgment that Flower has not had restored his right to sit on a jury is an acknowledgment that his civil rights have not adequately been restored to disqualify the use of those convictions as predicate convictions for the § 922(g)(1) charge.") (internal citation omitted) (emphasis in original).

For all the foregoing reasons, Defendants had probable cause to arrest Mr. Smith and could lawfully arrest him when he voluntarily opened the front door and exposed himself to the public. At the very least, it was not clearly established at the time that the deputy defendants could not arrest Mr. Smith under the circumstances alleged in the Amended Complaint. Mr. Smith's unlawful detention and arrest claim will therefore be dismissed.

### 2.     Excessive force

Claims of excessive force are analyzed under the objective reasonableness standard of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 395-97 (1989). The reasonableness of the officer's belief as to the appropriate level of force should be judged from the perspective of an officer on the scene, rather than with the 20/20 vision of hindsight. *Id.* at 396. Among the factors that courts should consider in determining whether a police officer applied excessive force are (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by

11

flight. *Id.*

Inherent in an officer's authority to make an arrest or detention is the authority to use reasonable force to effectuate the arrest or detention. *See Muehler v. Mena*, 544 U.S. 93, 98-99 (2005). "[T]he excessive force inquiry evaluates the force used in a given arrest or detention against the force reasonably necessary to effect a lawful arrest or detention under the circumstances of the case." *Cortez*, 478 F.3d at 1126. "The display of weapons, and the pointing of firearms directly at persons inescapably involves the immediate threat of deadly force. Such a show of force should be predicated on at least a perceived risk of injury or danger to the officers or others, based upon what the officers know at the time." *Holland ex rel. Overdorff v. Harrington,* 268 F.3d 1179, 1192 (10th Cir. 2001). "Where a person has submitted to the officers' show of force without resistence, and where an officer has no reasonable cause to believe that person poses a danger to the officer or to others, it may be excessive and unreasonable to continue to aim a loaded firearm directly at that person, in contrast to simply holding the weapon in a fashion ready for immediate use." *Id.* at 1193.

According to the allegations, after Mr. Smith admitted to being a convicted felon and to there being a firearm in the home, Mr. Smith refused to voluntarily turn over the firearm to Deputy Smith, arguing that the deputies had no jurisdiction. Deputy Mason responded that federal law, rather than New Mexico law, applied and that he would be turning it over to the ATF for prosecution. At that point, Defendants Dixon, Ouilette, Tutor, and Baker each pointed guns at or in the direction of Mr. Smith. Given the facts known to the officers, particularly that Mr. Smith was a felon, that there was a firearm somewhere in the home over which he indicated he had some control, that it was the middle of the night, and that Mr. Smith was arguing with the deputies about whether he was unlawfully possessing the firearm, the deputy defendants had reason to believe that Mr. Smith might be armed and dangerous to justify drawing and pointing their weapons out of concern for officer

safety while they continued their investigation into Mr. Smith being a felon in possession of a firearm. *See Reeves v. Churchich*, 484 F.3d 1244, 1260 (10th Cir. 2007) (holding that officers acted reasonably in having weapons displayed and ready for immediate use where they were attempting to apprehend potentially armed suspect); *United States v. Gama-Bastidas*, 142 F.3d 1233, 1240 (10th Cir. 1998) ("[T]he officers were justified in utilizing measures to protect themselves and the public. The felony stop procedures were predicated on a combination of the reasonable belief that the occupants of the vehicle may be armed, the probable cause to believe that the occupants were transporting cocaine, and the fact that the stop was executed on an automobile, during the night, on the side of a highway."); *Thompson v. City of Lawrence*, 58 F.3d 1511, 1516 (10th Cir. 1995) (holding that it was not unreasonable for officers to carry weapons when entering plaintiff's premises, to order plaintiff to floor, and to handcuff him because officers knew that plaintiff was a suspected felon with reputation for possessing firearms); *United States v. Perdue*, 8 F.3d 1455, 1462-63 (10th Cir. 1993) (holding that officers' investigative stop of vehicle with weapons drawn was reasonable because vehicle turned around suddenly upon viewing police activity on rural property where officers had found guns and marijuana being cultivated). *See also United States v. Copening*, 506 F.3d 1241, 1245, 1248-49 (10th Cir. Oct. 31, 2007) (unpublished opinion) (holding that officers did not use excessive force in detaining defendant by felony takedown with guns drawn because officers believed loaded firearm was in truck with two occupants and they were stopping vehicle on suspected weapons violation); *United States v. Merkley*, 988 F.2d 1062, 1063-64 (10th Cir. 1993) ("It is clear, however, that, because safety may require the police to freeze temporarily a potentially dangerous situation, both the display of firearms and the use of handcuffs may be part of a reasonable *Terry* stop."). Because the deputy defendants' actions did not violate clearly established law, the deputy defendants are entitled to qualified immunity on Mr. Smith's excessive

13

force claim.

### 3.    Unreasonable Seizure and Excessive Force Claims of Mrs. Smith

As for Mrs. Smith, she "was standing directly behind Plaintiff Henry Smith in the foyer of their front door at their home." (Am. Compl. ¶ 6.) There is nothing in the complaint indicating that she was detained or arrested. Rather, the Amended Complaint states that the deputies were pointing their guns "at or at [sic] the general direction of Henry Smith." (Am. Compl. ¶ 49.) In light of the Court's ruling that the deputy defendants had probable cause to arrest Mr. Smith and acted reasonably in pointing their weapons at him, any incidental seizure of Mrs. Smith was likewise reasonable. *See Thompson*, 58 F.3d at 1517 (holding that officers did not violate bystander's Fourth Amendment rights by shoving her to floor, drawing weapon on her, and handcuffing her because governmental interest in securing area around target whom they had probable cause to arrest and for whom they knew posed a potential danger to them was sufficient to justify her temporary detention).[2] The Court will therefore dismiss Mrs. Smith's unlawful seizure of her person and excessive force claims.

---

[2]Although Defendants seem to have conceded that Mrs. Smith was "seized," (*see* Defs.' Mot. (Doc. 71) at 10), this Court is not convinced that Mrs. Smith was "seized" within the meaning of the Fourth Amendment where she was merely standing behind Mr. Smith while the deputy defendants pointed their weapons at him and there is no allegation that she herself was targeted by the officers. *See Brower v. County of Inyo*, 489 U.S. 593, 595-97 (1989) (holding that person is seized only if she is detained by means intentionally applied to terminate her freedom of movement and that seizure occurs even when unintended person is object of detention, so long as means of detention are intentionally applied to that person); *Reeves*, 484 F.3d at 1252-53 (explaining that assertion of police authority by pointing weapons and making verbal commands does not amount to seizure unless target submits to assertion of authority); *Fisher v. City of Memphis*, 234 F.3d 312, 318 (6th Cir. 2000) (explaining that, while Fourth Amendment does not apply to § 1983 claims that seek remuneration for physical injuries inadvertently inflicted upon innocent bystander by officers' use of force while attempting to seize perpetrator, officers do seize any person who is a deliberate object of their exertion of force).

### 4.      Seizure of Firearm

Defendants additionally argue that the Court should reconsider its ruling denying the deputy defendants qualified immunity on Plaintiffs' claim that they unlawfully seized his firearm. Defendants contend that the seizure was reasonable because the deputy defendants' intrusion was minimal, given that they did not enter the home, and that it must be balanced against the government's interest in not having convicted felons possess firearms. Defendants further assert that there were exigent circumstances permitting the seizure, and alternatively, that its seizure was permitted even without exigent circumstances.

This Court has determined that the deputy defendants had probable cause to arrest Mr. Smith, and could do so because he was voluntarily standing in the doorway exposed to the public. Nevertheless, the legality of their alleged seizure of the firearm is an altogether different matter because that firearm was located within the home. Police officers need either a warrant or probable cause plus exigent circumstances to make a lawful entry into a home. *United States v. Flowers*, 336 F.3d 1222, 1227 (10th Cir. 2003) (quoting *Kirk v. Louisiana*, 536 U.S. 635, 638 (2002)). Absent exigent circumstances, the threshold of the home may not reasonably be crossed without a warrant. *Payton v. New York*, 445 U.S. 573, 590 (1980). *Payton* held that the Fourth Amendment has drawn a firm line at the entrance to the house. *Id.* "That line can be breached by conduct other than physical entry." *United States v. Reeves*, 524 F.3d 1161, 1165 (10th Cir. 2008).

Although the deputy defendants did not themselves enter the home, Deputy Mason ordered Mr. Smith to give him the gun while the other deputies held him at gunpoint. Mr. Smith's decision to have his son get the gun and give it to them was not voluntary and amounted to a warrantless seizure of the firearm in the home. *Cf. Flowers*, 336 F.3d at 1226 n.2 (holding that defendant was unlawfully arrested while in his home because his decision to open door to home was not voluntary

15

when officers commanded him to open door and allow them to enter).  For the deputy defendants'

conduct to be lawful, they needed exigent circumstances.

When a government agent enters a home without a warrant, "the burden is on the

government to demonstrate exigent circumstances that overcome the presumption of

unreasonableness that attaches to all warrantless home entries."  *Welsh v. Wisconsin*, 466 U.S. 740,

750 (1984).  The Supreme Court has recognized several types of exigent circumstances justifying

a warrantless entry: hot pursuit of a fleeing felon, the imminent destruction of evidence, the need

to prevent a suspect's escape, or the risk of danger to police officers or other persons.  *United States*

*v. Thomas*, 372 F.3d 1173, 1177 (10th Cir. 2004) (citing *Minnesota v. Olson*, 495 U.S. 91, 100

(1990)).  The Supreme Court and Tenth Circuit have made "quite clear that a warrantless search is

reasonable only when it falls within one of the clearly defined exceptions to the warrant

requirement."  *United States v. Bute*, 43 F.3d 531, 534 (10th Cir. 1994).

The hot pursuit doctrine and the need to prevent a suspect's escape clearly do not apply here.

According to Plaintiffs' facts, the deputy defendants had already arrested Mr. Smith by gunpoint

prior to their seizure of the firearm.  There are no facts in the complaint indicating Mr. Smith had

attempted to flee or escape.  The imminent destruction of evidence exigency likewise does not apply

because the firearm is not the type of contraband that can be easily destroyed during the time it takes

for the police to secure a warrant.

The only exigency that arguably could apply under these facts is the need to protect the

officers.  Indeed, this Court has concluded that the deputy defendants had reason to be concerned

for their personal safety sufficient to justify Plaintiff's public seizure at gunpoint.  The facts,

however, do not demonstrate as a matter of law that an exigency existed to take the further action

of seizing the firearm without a warrant.  The deputy defendants had already seized Mr. Smith and

16

they could have further secured the scene by handcuffing Mr. Smith while they obtained a search warrant.  The other occupants of the home were all standing directly behind Mr. Smith and there are no allegations indicating that they posed any additional threat.  Any concern that any of the other occupants of the home might use the firearm is belied by the allegation that the deputy defendants allowed one of the other occupants to get the firearm and bring it to them – actions no reasonable officer would allow if genuinely concerned for his and his fellow officers' safety.  Moreover, any such legitimate safety concern likewise could have been ameliorated by detaining the other occupants outside the home while they obtained a warrant.

Although officers may conduct a protective sweep of a house incident to an arrest, the officers must have a reasonable articulable suspicion to believe that another individual may be within the home who poses a danger to them.  *Maryland v. Buie*, 494 U.S. 325, 327 (1990).  The facts of the Amended Complaint do not show that the deputy defendants had reason to believe that there was anyone else in the house that posed a danger.  Again, no reasonable officer would have allowed Mr. Smith's son to retrieve the weapon if they believed other dangerous persons were inside.  For all these reasons, based on the facts construed in Plaintiffs' favor, after the deputy defendants arrested Mr. Smith, there were no exigent circumstances present to justify seizing the firearm without a warrant.  *Cf. Buie*, 494 U.S. at 335 ("We should emphasize that such a protective sweep, aimed at protecting the arresting officers, if justified by the circumstances, is nevertheless not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found."); *United States v. Cavely*, 318 F.3d 987, 998 (10th Cir. 2003) (upholding protective sweep of home where officers, after arresting suspect outside, had reason to believe there was another person in house who posed a danger to them and where there was no evidence that officers entered house merely for purpose of gathering incriminating evidence).

17

Defendants' alternative argument is that the seizure was not unreasonable because the firearm was plainly contraband, given Mr. Smith's admissions.  In support, Defendants cite cases allowing seizure of contraband under the plain view doctrine.  Under the plain view doctrine, if police are lawfully in a position from which they view contraband whose incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they can seize the object without a warrant.  *Minnesota v. Dickerson*, 508 U.S. 366, 374-75 (1993).  As its name reflects, the plain-view doctrine applies to the "first-hand perception of contraband."  *Texas v. Brown*, 460 U.S. 730, 739 (1983).  None of the cases cited by Defendants stand for the proposition that the plain view doctrine applies when the officers' probable cause as to the existence of contraband is from a suspect's admission, not from first-hand observation.  Nor do the cases involve the warrantless seizure of an object within a home, wherein the Fourth Amendment's protections are at their greatest, when exigent circumstances are not present.  The deputy defendants, under the facts presented in the complaint, did not have a lawful right of access to the firearm without a warrant or exigent circumstances and did not observe the firearm first-hand.  Consequently, the justifications underlying the plain-view doctrine do not create an exception to the warrant requirement in these circumstances.  *See Payton*, 445 U.S. at 587 ("It is one thing to seize without a warrant property resting in an open area or seizable by levy without an intrusion into privacy, and it is quite another thing to effect a warrantless seizure of property, even that owned by a corporation, situated on private premises to which access is not otherwise available for the seizing officer.") (quoting *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 354 (1977)); *United States v. Davis*, 94 F.3d 1465, 1470 (10th Cir. 1996) ("The [plain view] doctrine serves to supplement the prior justification-whether it be a warrant for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present unconnected with a search directed against the

18

accused.") (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 466 (1971)).

The law requiring exigent circumstances or a warrant to justify the seizure of the firearm was clearly established at the time of the complaint.  Under the clearly established law at the time, the deputy defendants should have known no exigency existed.  The deputy defendants are therefore not entitled to qualified immunity.

Finally, Defendants' argument that Plaintiffs' unlawful seizure of the firearm claim must be dismissed because they would not be entitled to damages for being dispossessed of a firearm that they could not lawfully possess is without merit.  The constitutional right at issue is Plaintiffs' Fourth Amendment right to their home and the objects contained therein.  Violations of constitutional rights may be vindicated even in the absence of compensatory damages.  *See Farrar v. Hobby*, 506 U.S. 103, 112 (1992) ("[T]he denial of procedural due process should be actionable for nominal damages without proof of actual injury. . . .The awarding of nominal damages for the 'absolute' right to procedural due process 'recognizes the importance to organized society that [this] righ[t] be scrupulously observed' while 'remain[ing] true to the principle that substantial damages should be awarded only to compensate actual injury.' . . . Thus, *Carey* obligates a court to award nominal damages when a plaintiff establishes the violation of his right to procedural due process but cannot prove actual injury.") (citing *Carey v. Piphus*, 435 U.S. 247, 266-67 (1978)); *Long v. Shillinger*, 927 F.2d 525, 528 (10th Cir. 1991) ("Since plaintiff did not allege, much less prove, that he suffered any injury as a result of the deprivation of due process alone, he was entitled to receive only nominal damages on his claim.").  The Court will therefore not dismiss Plaintiffs' Fourth Amendment unlawful seizure of a firearm claim against the deputy defendants in their individual capacities.

### B.    Supervisory and Municipal Liability

Plaintiffs assert in their Amended Complaint supervisory and municipal liability claims against the Board as well as the Commissioners and Sheriff Coon in both their individual and official capacities.[3]  As relevant to the remaining failure to train and supervise theories, Plaintiffs allege that the Board and Commissioners, with recklessness and deliberate indifference, improperly trained and supervised the Sheriff and his deputies and that they had "an unwritten custom or policy which permitted or condoned the violation of citizen's rights through unlawful searches and unlawful seizures." (Am. Compl. ¶ 4.)  Plaintiffs allege that the Board and Commissioners' acts and omissions were the direct cause of the taking of Plaintiffs' personal property and violation of their rights.  (*Id.*)  Plaintiffs assert that Sheriff Coon "merely went along with discretionary decisions made by his deputies, and failed in the training and supervision of his deputies," which was the moving force behind the violation of Plaintiffs' rights.  (*Id.* ¶ 5.)  Plaintiffs further allege that even the smallest amount of training or supervision would have prevented the unlawful actions committed by the deputy defendants.  (*See id.* ¶¶ 6-10.)

This Court has determined that the deputy defendants did not unlawfully detain or arrest Plaintiffs or use excessive force against Plaintiffs; therefore, the claims against the Board and the Commissioners and Sheriff Coon in their individual and official capacities based on those underlying claims likewise must be dismissed.  *See Martinez v. Beggs*, 563 F.3d 1082, 1091-92 (10th Cir. 2009) (holding that county or sheriff in his individual and official capacities cannot be held liable under supervisory and municipal liability theories when there was no underlying constitutional violation by any subordinate officer).  The only constitutional claim remaining upon

---

[3]Plaintiffs also assert claims against the deputy defendants in their official capacities, which this Court will treat as claims against the Board.  *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.").

which Plaintiffs may potentially assert *Monell* and supervisory claims against the Board, the Commissioners, and Sheriff Coon is their Fourth Amendment claim for unlawful seizure of the firearm.

Defendants argue that all claims based on a failure to supervise theory must be dismissed because there is no more supervisory liability after *Ashcroft v. Iqbal*, __, U.S. __, 129 S.Ct. 1937 (2009), and that the claims based on a failure to train must be dismissed because Plaintiffs failed to identify in their complaint what training would have prevented the alleged violation.  Finally, Defendants argue that, should the Court not dismiss all the *Monell* claims against the Board, it should nevertheless dismiss the claims against the individual Commissioners and Sheriff Coon in their official capacities because they are redundant of the claims against the entity.   After reconsidering the pleadings, arguments, and relevant law, the Court concludes that it erred in its initial determination that Plaintiffs had alleged sufficient facts to state supervisory and municipal liability claims against the Board, the Commissioners, and Sheriff Coon based on the failure-to-train and failure-to-supervise theories.

## 1.    Supervisory Liability

The Tenth Circuit has long rejected the theory of respondeat superior liability in § 1983 claims.  *Dodds v. Richardson*, __ F.3d __, 2010 WL 3064002 (10th Cir. 2010) (citing *Gagan v. Norton*, 35 F.3d 1473, 1476 n.4 (10th Cir. 1994)).   Instead, the Tenth Circuit has held that "[i]ndividual liability under § 1983 must be based on personal involvement in the alleged constitutional violation." *Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008) (quoting *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997)).  The Tenth Circuit recently described its pre-*Iqbal* requirements to establish supervisory liability in a § 1983 claim as follows:

In sum, to impose § 1983 liability the plaintiff first had to establish "the supervisor's

21

subordinates violated the [C]onstitution." Then, the plaintiff must demonstrate "an 'affirmative link' between the supervisor and the violation. . . ." Over time, this "affirmative link" requirement came to have three related prongs: (1) personal involvement, (2) sufficient causal connection, and (3) culpable state of mind. A plaintiff could establish the defendant-supervisor's personal involvement by demonstrating his "'personal participation, his exercise of control or direction, or his failure to supervise,'" or his "knowledge of the violation and acquiesce[nce] in its continuance." A defendant supervisor's promulgation, creation, implementation, or utilization of a policy that caused a deprivation of plaintiff's rights also could have constituted sufficient personal involvement. A plaintiff then had to establish the "'requisite causal connection'" by showing "'the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights.'" And, finally, the plaintiff also had to show the supervisor had a culpable state of mind, meaning "the supervisor acted knowingly or with 'deliberate indifference' that a constitutional violation would occur." We did not view these requirements as necessarily distinct. Proof of a supervisor's personal direction or knowledge of and acquiescence in a constitutional violation often sufficed to meet the personal involvement, causal connection, and deliberate indifference prongs of the affirmative link requirement for § 1983 supervisory liability.

*Dodds*, __ F.3d at __, 2010 WL 3064002 at * 6 (internal citations and footnotes omitted).

In 2009, the Supreme Court made clear that there is no respondeat superior liability under § 1983: "Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 129 S.Ct. at 1948. The Supreme Court explained that the factors to establish a *Bivens* violation "will vary with the constitutional provision at issue." *Id.* In analyzing the plaintiff's discrimination claim under the First and Fifth Amendments, the Supreme Court held that the plaintiff had to prove that the defendant supervisors acted with discriminatory purpose. *Id.* at 1948-49. The Supreme Court further concluded that the supervisors' alleged deliberate indifference to or knowledge and acquiescence in their subordinates' unconstitutional conduct or discriminatory animus, alone, did not amount to the requisite purposeful discrimination state of mind to establish that the supervisors violated the plaintiff's equal protection rights. *See id.* at 1948-49,

1952.  The Supreme Court explained: "In a § 1983 suit or a *Bivens* action – where masters do not answer for the torts of their servants – the term 'supervisory liability' is a misnomer.  Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."  *Id.* at 1949.

The Tenth Circuit very recently in *Dodds v. Richardson* analyzed *Iqbal*'s "stricter liability standard."  *See Dodds*, ___ F.3d at __, 2010 WL 3064002 at *8.  The Tenth Circuit concluded that, "[w]hatever else can be said about *Iqbal*," at least one form of liability against defendant-supervisors survives:

> A plaintiff may therefore succeed in a § 1983 suit against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.

*Id.*  The Tenth Circuit further noted that *Iqbal* "may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit" in other ways, but it declined to reach the issue as to what other theories survive.  *Id.* at *9.  It is thus unclear whether failure-to-train and failure-to-supervise theories remain valid theories after *Iqbal*.  This Court, however, need not resolve at this time whether and how failure-to-supervise and failure-to-train theories survive in the post-*Iqbal* world, because Plaintiffs have not pled facts sufficient to state a plausible entitlement to relief under the Tenth Circuit's previous formulation of the standard for supervisory liability.

"[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).  To establish liability under a failure-to-train theory, a plaintiff must prove that (1) an officer violated a constitutional right of the plaintiff's; (2) the violation arose under circumstances that constitute a usual and recurring

situation with which police officers must deal; (3) the inadequate training demonstrated a deliberate indifference by the defendant toward persons with whom the officer comes into contact; and (4) there is a direct causal link between the inadequate training and the unconstitutional conduct.  *See Carr v. Castle*, 337 F.3d 1221, 1228 (10th Cir. 2003).  *See also Meade v. Grubbs*, 841 F.2d 1512, 1528 (10th Cir. 1988) ("A supervisor or municipality may be held liable where there is essentially a complete failure to train, or training that is so reckless or grossly negligent that future misconduct is almost inevitable.").

Here, the pleadings do little more than assert the legal conclusion that the Commissioners failed to train and supervise the deputy defendants and Sheriff Coon, who in turn failed to train and supervise the deputy defendants. The Amended Complaint parrots the standards necessary for supervisory liability without providing enough facts to establish what the training was or should have been to avoid the alleged unconstitutional seizure of the firearm. Nor does the Amended Complaint allege what specific skills the deputy defendants needed to handle recurring situations for which the supervisory defendants failed to provide training.  Nor does the Amended Complaint allege a pattern of past constitutional violations that would have given the supervisory defendants notice that their failure to train or supervise was substantially certain to lead to constitutional violations.  Plaintiffs' Amended Complaint alleges no more than legal conclusions against the Commissioners and Sheriff Coon in their individual capacities, and thus, the complaint fails to state a claim that plausibly gives rise to an entitlement to relief.  *See Iqbal*, 129 S.Ct. at 1949 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  Plaintiffs' supervisory claims will therefore be dismissed.  *Compare Sanchez v. Pereira-Castillo*, 590 F.3d 31, 49-50 (1st Cir. 2009) (concluding that complaint failed to show plausible entitlement to relief against supervisory defendants on supervisory liability/failure to train

24

claim based merely on allegations that defendants, with deliberate indifference, failed to ensure that officers under their command followed procedures to respect rights of plaintiff and that surgery resulted from strip search and x-ray policies), *with Davis v. City of Aurora*, __ F.Supp.2d __, 2010 WL 1348450, *15-16 (D.Colo. 2010) (refusing to grant supervisory defendants qualified immunity where complaint alleged significantly more facts about policy, specifically that supervisory defendants created or allowed creation of policy that required officers, upon report of suspected burglary, to unconstitutionally seize subject without objective criteria, which thus dictated seizure of burglary suspects with guns).

### 2.       Municipal liability

Like supervisors sued in their personal capacities, municipalities cannot be held liable under 42 U.S.C. § 1983 on a *respondeat superior* theory for merely employing a tortfeasor. *Monell*, 436 U.S. at 691. Municipalities, instead, are subject to § 1983 liability only when their official policies or customs cause a plaintiff's injuries. *Id*. at 694; *Johnson v. Johnson*, 466 F.3d 1213, 1215 (10th Cir. 2006). For the same reasons that Plaintiffs' Amended Complaint fails to state a claim against the defendant supervisors in their individual capacities, Plaintiffs fail to state a plausible claim for municipal liability. *Cf. Carr*, 337 F.3d at 1229 (holding that plaintiff's scattershot recital of alleged inadequacies in training were not sufficient to establish city's liability because plaintiff failed to show how city had notice that its actions or failures to act were likely to result in constitutional violations and how city consciously chose to disregard risk of harm). Accordingly, Plaintiffs' claims against the Board and against all other defendants sued in their official capacities will be dismissed.


**IT IS THEREFORE ORDERED** that Defendants' Motion to Dismiss Unlawful Detention or Arrest and Excessive Force Claims and to Reconsider Denial of Motion to Dismiss Fourth

Amendment Seizure, Failure to Train and Failure to Supervise Claims on the Basis of Qualified Immunity and Other Grounds (**Doc. 71**) is **DENIED** in part and **GRANTED** in part as follows:

1.      Defendants' request to dismiss Plaintiffs' Fourth Amendment claims for unlawful detention or arrest and excessive force is **GRANTED**;

2.      Defendants' request to dismiss Plaintiffs' supervisory and municipal liability claims is **GRANTED**;

3.      Defendants Board of County Commissioners for the County of Chaves, New Mexico; County Commissioners Michael Trujillo, Kim Chesser, Kyle D. Wooten, Richard C. Taylor, and Greg Nibert, in their individual and official capacities; and Chaves County Sheriff James Coon, in his individual and official capacity, are thereby **DISMISSED WITH PREJUDICE** and the *official capacity claims* against Defendants Barry Dixon, Shane Baker, James Mason, Jason Tutor, and Scott Ouillette are thereby **DISMISSED WITH PREJUDICE**; and

4.      Defendants' request to dismiss Plaintiffs' Fourth Amendment claims for unlawful seizure of the firearm is **DENIED** as to Defendants Barry Dixon, Shane Baker, James Mason, Jason Tutor, and Scott Ouillette in their individual capacities.

_____

**SENIOR UNITED STATES DISTRICT JUDGE**